Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MARY SMITH, individually and on behalf of JOHN DOE a minor,<br><br>             Plaintiff,<br><br>vs.<br><br>AETNA LIFE INSURANCE COMPANY, and the LOCKHEED MARTIN GROUP BENEFITS PLAN,<br><br>             Defendants. | AMENDED COMPLAINT<br><br>1:22-cv-00069 – DBP<br><br>Magistrate Judge Dustin B. Pead |

Plaintiff Mary Smith ("Mary"), individually and on behalf of John Doe ("John") a minor, through her undersigned counsel, complains and alleges against Defendants Aetna Life Insurance Company ("Aetna") and the Lockheed Martin Group Benefits Plan ("the Plan") as follows:

## PARTIES, JURISDICTION AND VENUE

1. Mary and John are natural persons residing in New Jersey. Mary is John's mother.

2.  In light of the sensitive nature of the medical information contained in the Complaint and at issue in this case, Mary and John are identified by pseudonyms in this complaint to protect their privacy.

3.  Aetna is an insurance company headquartered in Hartford, Connecticut and was the third-party claims administrator, as well as the fiduciary under ERISA for the Plan during the treatment at issue in this case.

4.  The Plan is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan provides insurance coverage for employees of the sponsoring employer and their families. Mary and John received coverage under the Plan through John's father who was the participant in the Plan. John's father is now deceased. Mary and John were beneficiaries of the Plan at all relevant times.

5.  John received medical care and treatment at Elevations RTC ("Elevations") from March 16, 2020 to January 6, 2021. Elevations is a licensed residential treatment facility located in Davis County Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

6.  Aetna denied claims for payment of John's medical expenses in connection with his treatment at Elevations.

7.  This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

8.  Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Aetna has business

offices and carries out substantial commerce in Utah, and the treatment at issue took place in Utah.

9.  In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs she will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's desire that the case be resolved in the State of Utah where it is more likely both her and John's privacy will be preserved.

10. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### John's Developmental History and Medical Background

11. Around the time that he was six months old, John had a rare type of seizure which led to him being hospitalized. This caused John to have delays in reaching his developmental milestones and John was enrolled in an early intervention program.

12. John's family moved very frequently when he was growing up which was a great source of anxiety for John and caused him to have difficulty making and keeping friends. John was bullied by others and often had angry outbursts and symptoms like stomachaches and headaches when it was time to go to school.

13. John's father was diagnosed with a terminal illness, and John started self-harming by cutting. John also stated that he felt suicidal and had heard a voice telling him to drown himself in the bathtub. John was taken to the hospital from May 17, 2018, through May 22, 2018, and was diagnosed with an anxiety disorder. John then began attending an intensive outpatient program.

14. On June 9, 2018, John stated that he had a plan to kill himself using knives or by choking. John was then readmitted to the hospital and stayed there through June 20, 2018. John was given a neuropsychological evaluation and was additionally diagnosed with Major Depressive Disorder and his medications were adjusted. John again began receiving intensive outpatient care.

15. John continued to report hearing voices telling him to harm himself. He was re-hospitalized and began attending a partial hospitalization program on September 28, 2018, after which he again received intensive outpatient care.

16. John became increasingly defiant and physically aggressive; he began refusing to go to school and would also refuse medications and food. John confided in a peer that he was feeling suicidal, but instead of offering support, the boy made fun of John

17. John's medications were continually adjusted with little effect. John increasingly isolated himself and used video games and electronics as a coping mechanism. John had difficulty regulating his emotions and continued to distance himself from others, refused to go to school, and engaged in self-harming behaviors.

18. In September of 2019, Mary called the police to stop John from self-harming. John asked the police officer to shoot him and he was once again hospitalized. John stated that he believed he would die before he turned eighteen.

19. On October 2, 2019, John was discharged from the hospital and again began attending an intensive outpatient program. John was sent home from the hospital prematurely due to his father's rapidly declining health and the fear that John's father might die while John was hospitalized.

20. Hospital staff recommended that John receive long-term mental health care to help resolve his issues. Mary stated that if it were not for the concern that John would have missed his father's funeral, she would have enrolled him in residential care at this time.

21. Due to the medications John's father was taking, his personality changed and he often lashed out at John which was very uncharacteristic of him before the terminal diagnosis. This placed a great amount of strain on the relationship between John and his father until he passed away.

22. On January 5, 2020, John attempted suicide. He was again hospitalized and claimed that nobody loved him and he was going to "die at age sixteen or seventeen anyways." John was then admitted to a facility called ViewPoint Center on January 16, 2020, before being transferred to Elevations.

**Elevations**

23. John was admitted to Elevations on March 16, 2020.

24. In a letter dated March 17, 2020, Aetna denied payment for John's treatment at Elevations. The letter gave the following justification for the denial:

> We reviewed information received about your condition and circumstances. We used the Level of Care Assessment Tool (LOCAT) guidelines for residential treatment. Based on LOCAT criteria and the information we have, we are denying coverage for the requested level of care. The information received does not show that you have very poor judgment or thinking and that you may or have hurt yourself or put your life at risk. Treatment could be provided at a less intensive level of care or in another setting.

(Medical Necessity Denial) This coverage denial was based on the terms of the member's benefit plan document (such as the Certificate of Coverage or benefit plan booklet/handbook, including any amendments or riders). The plan does not cover services that are not medically necessary. Please see the reference to non-medically necessary services listed in the Exclusions section of the benefit plan document or refer to the description of medically necessary services in the Definitions or Glossary section of the benefit plan document.

25. Aetna also sent a second denial letter from the same reviewer which analyzed the same dates of service which gave a slightly different justification for denial. It stated in pertinent part:

> We reviewed information received about the member's condition and circumstances. We used the Level of Care Assessment Tool (LOCAT) guidelines for residential treatment. Based on LOCAT criteria and the information we have, we are denying coverage for the requested level of care. The member does not meet the following criteria for this level of care: behavior that demonstrates impaired judgment to the extent that serious harm has occurred or may occur, including risk of death. Treatment could be provided at a less intensive level of care or in another setting.

26. On July 20, 2020, Mary submitted a level one appeal of the denial of payment for John's treatment. Mary noted that Aetna had not listed the full dates of service in its denial letters and made clear that she was appealing the full dates of service from John's admission to his discharge.

27. She reminded Aetna that under ERISA she was entitled to certain protections during the review process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information she provided, and which gave her the specific reasons for the adverse determination, referenced the specific plan provisions on which the determination was based, and gave her the information necessary to perfect the claim.

28. She also asked that the reviewer have training concerning MHPAEA and requested a physical copy of any documentation used, including case notes.

29. She wrote that John's conditions had not been able to be treated adequately at other

    levels of care. She stated that the slow decline and death of his father was particularly

    hard on John, especially when the medications and progression of the terminal illness

    caused his father to lash out and have temper control issues.

30. Mary included letters of medical necessity with the appeal. In a letter dated May 12,

    2020, Lynne Stein, MD., wrote in part:

> I continue to feel that [John] must have longterm residential care in a therapeutic
> setting to help him stabilize from his very serious mental illness, maintain his
> safety, and protect his family from harm by [John]
>
> [John] presented with a psychotic depression which is severe and did not resolve
> with medication and extensive therapy. He feels he is possessed by the devil and
> he hears the voice of the devil quite often. As a result, he is fearful that something
> very bad will happen. Throughout the course of his stays he insisted that he would
> not live past his seventeenth birthday. He was not sure how he would die but he
> felt certain that his death was imminent. At times he heard the voice of the devil
> and felt frightened that he might do something very destructive to his family. He
> had thoughts at times of hurting his dad and had pushed dad when he was on
> blood thinners. He also harbored thoughts at times to hurt himself and
> occasionally he cut himself and had suicidal ideas. [John] insisted that the only
> way he could distract himself from the voice and feelings about the devil was to
> play endless hours of video games. Huge battles occurred which included
> destruction of property, aggression to mom and shouting matches when mom tried
> to set any limits on his video game playing. He also insisted on calling peers he
> met at the hospitals which proved to be very detrimental to him. Again when
> mom set any limits, huge battles would ensue. Mom frequently feared for her
> safety and had to call emergency lines for help many times to keep her, his
> brother and [John] safe. [John] also had great difficulty attending school.
> Frequently he refused to go to school and battles over going to school occurred
> quite often.
>
> The family's participation in [John]'s treatment was admirable. [John]'s mom is
> totally devoted to his well being. She educates herself constantly and is extremely
> involved in his therapy and open to all suggestions. She worked very well with
> the inhome therapists and tried the strategies recommended. [John] also had very
> loving grandparents and uncle who came regularly to the house and assisted mom
> in caring for [John].
>
> Despite extensive inpatient, outpatient, inhome treatment, and pharmacotherapy,
> [John]'s condition did not improve sufficiently to enable him to live in the home

safely and attend school. [John] is a very bright, intelligent and creative youngster. He is a pleasure to treat and worked hard in our programs. He has been tormented by his Dad's untimely death and unable to mourn the loss. His severe depression with psychotic features has proven extremely refractory to treatment and he clearly needs more help. I therefore continue to feel that it is essential that [John] be placed in an excellent longterm residential treatment facility with a strong therapeutic component and good academics. Because of [John]'s many strengths, I feel certain that [John] will make good progress in such a setting and have a bright future.

31. Linda Wiles, LCSW wrote in part in a letter dated May 4, 2020:

On January 5, 2020, this therapist received a phone call from [Mary], [John]'s mother. [Mary] and [John] were at the local Crisis Screening Center, and she was requesting input on inpatient psychiatric hospitalization. [John] had sent his last will and testament to several of his classmates and one of them had shown the email to his mother. The classmate's mother had contacted [Mary], who had found [John] with cuts on his wrist and a man-made noose. She immediately contacted 911 and had to forcefully prevent him from making further attempts until the police arrived. [Mary] reported that she had told him that she could not afford to lose him. She had just lost his father. He responded that you still have my younger brother. He was admitted in to Carrier Clinic for inpatient psychiatric hospitalization. While he was at Carrier Clinic, the social worker was in consultation with this therapist for treatment and discharge planning. It was reported from the social worker that [John] was still intent on ending his life. After Carrier Clinic, [John] was transferred to Viewpoint in Utah for further diagnostic and therapeutic inpatient psychiatric services. At Viewpoint, this therapist was also consulted by [John]'s therapist, who reported that [John] was insistent on joining his father and he was still at risk.

From April 22-27, 2020, this therapist had several conversations with [Mary] in reference to [John] receiving long term residential services to address his ongoing depression and mental health challenges. This therapist, although not part of the current treatment team, would be in agreement with this recommendation at this time.

32. Ruby Laufer OTR/L wrote in part in a letter dated April 13, 2020.

At the time that I started working with [John], he had tried many forms of treatment. [John] had been hospitalized several times and participated in programs ranging from partial hospitalizations to intensive outpatient programs. None of these interventions had lasting effect.

In addition to obtaining a full psychiatric history from [John]'s mother and reviewing previous psychological information, I also spoke with the treating professionals at Carrier Clinic. Upon discharge from Carrier Clinic, it was

recommended that [John] need continued specialized care. They felt that his needs were too great to be treated in an outpatient setting.

I recommended placement at the ViewPoint Center in Syracuse, Utah. We were fortunate that they had an opening and could accommodate us quickly. Viewpoint Center was able to provide [John] with a safe environment to further stabilize as well as to conduct a thorough assessment of his needs. It is this assessment that guides [John]'s treatment today.

Viewpoint Center was clear that [John] has chronic suicidal thoughts and needs ongoing residential care. He continues to suffer from severe depression, anxiety as well as some psychotic thinking believed to be related to his depression. With the help of Viewpoint's guidance, we were able to determine that Elevations RTC, also in Syracuse, Utah, would be the medically necessary level of care. [John]'s placement at Elevations RTC with their highly clinical level of care, is necessary for [John]'s basic safety and to provide him the treatment he needs for significant and lasting improvement.

33. Mary wrote that residential treatment was the lowest level of care at which John could be safely and effectively treated. She pointed out that other interventions – including inpatient hospitalizations – had been attempted but they had been unsuccessful. She noted that John had attempted suicide while at home and contended that he required residential treatment care in order to stay safe and effectively address his mental health concerns.

34. Mary also included copies of recommendations from John's treatment team at ViewPoint which advised that he receive further residential treatment. She wrote that all of the clinical professionals who had worked with John on a firsthand basis had recommended that he receive treatment at the residential level of care. She asked Aetna to clarify on what basis it disagreed with these individuals who had actively witnessed the deterioration of John's condition.

35. She contended that Aetna's LOCAT tool violated generally accepted standards of medical practice and incorrectly relied on factors such as acute dangerousness for a subacute level of care to be approved.

36. She pointed out that Aetna's criteria for acute inpatient hospitalization and residential treatment were strikingly similar, and in some cases, such as the suicidal intent category, the requirements for residential treatment and acute inpatient hospitalization were identical and had even been listed jointly under the same definition.

37. She wrote that Aetna's criteria made no effort to differentiate between adults and children and argued that they largely conflated acute inpatient hospitalization with sub-acute residential treatment.

38. Mary additionally alleged that Aetna was in violation of MHPAEA. She wrote that MHPAEA compelled insurers to provide benefits for mental healthcare at parity with comparable medical or surgical services and identified intermediate level facilities such as skilled nursing treatment as the appropriate medical/surgical analogues to the residential treatment John received.

39. She argued that Aetna did not impose treatment limitations such as a requirement that an insured exhibit acute level symptoms in order to receive sub-acute medical or surgical care, but that it did do this for sub-acute residential treatment. She stated that these subacute facilities were "neither expected to treat nor equipped to handle" patients with acute care needs.

40. She requested that Aetna perform a MHPAEA compliance analysis and to provide her with physical copies of the results of this analysis. She also asked that the reviewer utilize the definition of medical necessity found in the insurance policy rather than any proprietary criteria to further evaluate John's treatment. She argued that John's treatment met the definition of medical necessity as found in the insurance policy.

41. Mary again asked to be provided with a copy of the governing plan documents.

42. In a letter dated August 20, 2020, Aetna upheld the denial of payment for John's

treatment between March 18, 2020, through June 30, 2020. The letter gave the following

justification for the denial:

> Per the information we reviewed we learned your son is a 15 year old male when
> he was [sic] admitted to MH RTC.. [sic] He had been in another RTC, and was
> then transferred, for reasons unclear in the documentation reviewed. He was
> diagnosed with dysthymia and was not taking prescribed medications for this
> condition, For the date of denial under consideration in this appeal he was
> medically stable; not considered actively suicidal or homicidal; in control of his
> impulses and not exhibiting violence nor physical aggression or destruction of
> property; was able to recognize reality and denied hearing or seeing what was not
> real, not expressing suspicion with thoughts about others representing a danger to
> him; nor extreme mood swings from incapacitating depression to mania.
>
> We reviewed information received about his condition and circumstances. We
> used the Level of Care Assessment Tool (LOCAT) guidelines for residential
> treatment. It does not appear that the residential treatment center stay was
> required for the dates of service under consideration in this appeal beginning with
> March 16, 2020.[1] The intensity of his active treatment could have been provided
> appropriately in an alternative level of care (ALOC), e.g. Mental Health Partial
> Hospital Program (MH PHP). It did not appear he was at risk for self-harm or
> otherwise in need of 24-hour supervision and treatment. Based on LOCAT criteria
> and the information we have, we are upholding the denial of overage [sic] for the
> RTC level of care. He did not meet the following criteria for this level of care:
> behavior that demonstrates impaired judgment to the extent that serious harm has
> occurred or may occur, including risk of death. Change in the current level of care
> did not appear to increase the risk of his re-admission to RTC. Treatment could be
> provided at a less intensive level of care or in another setting e.g. MH Partial
> Hospital Program (MH PHP) Denial is upheld.

43. The denial then quoted language concerning the definition of medical necessity from the

plan document.

44. On September 30, 2020, Mary submitted a level two appeal of John's treatment from his

admission to discharge. She pointed out that Aetna's denial had not addressed the full

---

[1] Although the letter correctly states here that John was admitted to treatment on March 16, 2020,
the letter repeatedly references March 18, 2020, as the first date of denial. It is unclear whether
this is a simple typographical error (repeated multiple times), a lack of attention to detail on
Aetna's part, or whether Aetna intended to approve the first two days of John's treatment.

dates of service and asked it to correct the error. She contended that despite the fact that she had reminded Aetna of its minimum obligations under ERISA, it had failed to comply with the statute.

45. She argued that Aetna had provided her with no "clear and specific" reason for its denial, nor had it complied with its obligation to produce documents. She wrote that Aetna had sent her a packet entitled "Request for Relevant Documents," but the only thing present in the packet was a copy of its ASAM criteria which, she noted, dealt almost entirely with substance abuse.

46. She questioned what relevancy substance use guidelines had in John's case, given that he did not have a substance use problem, and expressed concern that if Aetna had utilized these criteria to determine the medical necessity of John's treatment, they would not have been applicable.

47. She wrote that Aetna had not acknowledged any of the arguments she had raised, including her contention that it violated MHPAEA. In fact, she alleged that not only had Aetna not addressed her arguments that it violated MHPAEA, but it continued to violate MHPAEA in the same ways with no attempt to address or resolve its lack of compliance. She again asked Aetna to perform a MHPAEA analysis on the Plan and to provide her with a copy of the results of this analysis.

48. She alleged that Aetna continued to violate generally accepted standards of medical practice and that it intentionally utilized overly restrictive criteria which contradicted the actual terms of the plan document.

49. She reiterated that other levels of care had been attempted to treat John but had not been effective. She expressed her concern that Aetna would list factors such as "not taking

prescribed medication" as a justification that John needed outpatient treatment. She wrote that if this signaled anything, it was that John required more intensive treatment interventions, not less intensive ones.

50. Mary included an updated copy of John's medical records with the appeal. These records showed that John continued to struggle with depression, thoughts of hurting himself and others, delusions, intrusive thoughts, being placed on self-harm safety precautions, and running away from treatment, even while actively participating in the secure environment of a residential treatment center. Mary again asked to be provided with a copy of the governing plan documents.

51. In a letter dated October 26, 2020, Aetna upheld the denial of payment for John's treatment. The letter gave the following justification for the denial:

Based upon our review of the information provided we are upholding the original benefit determination for coverage at a residential level of care for dates of service March 16, 2020[2] through June 30, 2020. Review of the medical chart and correspondence indicates the patient is a 15-year-old male diagnosed with dysthymia who entered treatment at this facility on March 16, 2020, from another residential facility where he was admitted on January16 [sic], 2020, with treatment approved through March 19, 2020, but was then transferred to another facility for reasons unclear in the documentation reviewed. Review of the records indicate that your son was on nutritional supplements and on no psychotropic medications. For the dates under consideration he was medically stable. Your son was not actively suicidal, violent, unable to recognize reality, severely depressed or otherwise in an emergency. [John] was cooperative with all aspects of treatment interventions. There is no evidence that he was a credible risk for self-harm or otherwise in need of 24-hour supervision and treatment. Records provide no compelling indication for care in an inpatient setting during this time, or that care could not reasonably continue safely and effectively in an outpatient setting. LOCAT criteria do not support residential as the medically necessary level of care but do support Intensive outpatient setting. Denial is upheld.

---

[2] Elsewhere in the letter the dates are once again listed (presumably incorrectly) as between March 18, 2020, to June 30, 2020. If Aetna did mean to authorize the first two dates of service, it did not issue payment for these dates.

We understand that you were requesting a review from March 18, 2020,[3] to the discharge date. Since we are unaware of the discharge date, we are only able to review the dates of service on file.

The appeal for the dates of service July 1, 2020, through September 15, 2020, is being handled under case 2020102302807. You will receive a response under a separate mailing.

Your request for relevant documents has been sent to a different department for handling and you will receive them under separate cover.

52. In a letter dated October 27, 2020, Aetna denied payment for dates of service July 1, 2020, to September 15, 2020. Although the letter was attributed to "An Aetna medical director, board certified in psychiatry, with a professional designation of MD, and two complaint and appeal analysts, who were not involved in the original decision," the denial rationale is nearly identical to the October 26, 2020, letter with some minor changes in wording.

53. As Aetna did not comply with its ERISA obligation to identify its reviewers in spite of Mary's explicit requests, it is unclear if the same review team performed both evaluations, or if the second review team simply reused the findings of the first with some minor alterations.

54. John was discharged from Elevations on January 6, 2021.

55. On March 30, 2021, Mary submitted an appeal which addressed the time period denied in Aetna's denial letters, as well as an Explanation of Benefits statement for dates of service December 16, 2020, through December 31, 2020.

56. At the time Mary drafted this appeal, Aetna had paid for dates of service from September 16, 2020, through December 15, 2020. Aetna later reversed this decision claiming that the payment was "accidental" and recovered these amounts from Elevations.

---

[3] Again, Mary requested a review from March 16, 2020, to the discharge date.

57. Mary is seeking the full amount owed by Aetna for all denied dates of service, but due to the fact that at the time Aetna had approved coverage for September 16, 2020, through December 15, 2020, these dates were not listed in Mary's March 30, 2021 appeal.

58. Mary disputed Aetna's assertion that John was on "nutritional supplements and on no psychotropic medications." She wrote that John's medications were regularly adjusted by his treatment team based on their observations and consistent monitoring in order to find the most effective medication regimen for him.

59. She stated she had also received an Explanation of Benefits statement which stated that "The provider did not notify us or did not notify us in time about this inpatient stay."

60. She wrote that her appeal had been submitted timely and contended that John's treatment remained medically necessary. She included updated medical records with the appeal and asked Aetna how it could have denied John's claims in good conscience. She again asked for a copy of all documents under which the Plan was operated.

61. In a letter dated April 21, 2021, Aetna stated that Mary was not eligible for an external review as she had not submitted a level two appeal for dates of service between July 1, 2020, through September 15, 2020.

62. In spite of this factually incorrect assertion, in a decision dated May 25, 2021, external review agency AllMed did conduct an evaluation for dates of service between March 18, 2020, and June 30, 2020. It is unclear why Aetna and the external reviewer chose to selectively assess certain portions of John's treatment given that at no point did Mary ask for the review to be limited to those dates. The reviewer stated in pertinent part:

> According to the plan definition, services and supplies are medically necessary when they meet all of the following:

- In accordance with generally accepted standards of medical practice **(NOT MET, as a lower level of care would have been standard of care)**
- Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease **(NOT MET, as a lower level of care would have been more clinically appropriate)**
- Not primarily for the convenience of the patient, physician, or other health care provider **(NOT MET, as convenience is noted as a lower level of care would have been more appropriate)**
- Not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease. **[1] (NOT MET, as a lower level of care would have been more appropriate and less costly)**

The progress notes documented the patient on 3/26/20 stating in family therapy that he had not self-harmed since 1/5/20, and the notes also indicate that he did not from 3/18/20-6/30/20. The psychotherapy notes from 4/22/20 onwards noted intermittent passive suicidal and brief homicidal thoughts, as well as "intrusive thoughts;" however, there was no suicidal or homicidal intent or plan so that 24-hour residential monitoring was not required. The notes indicate that the treatment team did not consider the patient to represent serious risk of self-harm as he was permitted to leave the 24-hour supervised confines of the residential program to go on outings, such as rock climbing on 5/9/20. He was not physically aggressive and did not require use of physical restraints. He did have intermittent psychotic symptoms (religious delusions, thought disorder) but these did not require 24-hour residential treatment, but instead could have been monitored and treated with psychotropic medication in a lower level of care. The MD notes documented at times "questionable personal hygiene," but the patient was eating, drinking, and sleeping adequately, so this did not require 24 hour nursing supervision in a residential setting. There was no diagnosis of a comorbid substance abuse or uncontrolled medical disorder, so that 24 hour residential treatment was not required on that basis. By 3/18/20 the patient had already undergone sufficient clinical stabilization in the prior inpatient psychiatric hospital stay and the prior residential treatment at another facility (from 1/16/20-3/15/20) so that he no longer required the intensity of residential mental health treatment, but would have been appropriate for treatment in a lower level of care instead.

63. It is unclear why Aetna stated that dates of service between July 1, 2020, and September 15, 2020, were not eligible for consideration, while approving an external review request which examined dates of service from March 16, 2020, (or March 18, 2020, as the letter

is once again inconsistent) and June 30, 2020. Adding to the confusion is the fact that Aetna did not even address all of the dates Mary asked it to examine.

64. The Plaintiff exhausted her pre-litigation appeal obligations under the terms of the Plan and ERISA.

65. The denial of benefits for John's treatment was a breach of contract and caused Mary to incur medical expenses that should have been paid by the Plan in an amount totaling over $200,000.

66. Aetna did not fully comply with its ERISA obligation to provide Mary with the documents under which the Plan was operated.

## FIRST CAUSE OF ACTION

### (Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))

67. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Aetna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

68. Aetna and the Plan failed to provide coverage for John's treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

69. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

70. The denial letters produced by Aetna do little to elucidate whether Aetna conducted a

meaningful analysis of the Plaintiff's appeals or whether it provided her with the "full and fair review" to which she is entitled. Aetna failed to substantively respond to the issues presented in Mary's appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

71. In fact, Aetna committed multiple errors during the review process, such as listing the incorrect dates of service, incorrectly claiming that Mary was not entitled to an external review for certain dates of service because she had not appealed those dates, when she had in fact done so, responding to Mary's request for a copy of the governing plan documents with substance use criteria which did not apply, and refusing to divulge the identities of its reviewers in spite of its statutory obligation and Mary's requests that it do so.

72. ERISA requires insurers to make "Reference to the specific plan provisions on which the determination is based." Aetna justified its denial in large part by imposing requirements which were not found in the terms of the plan document or its own criteria.

73. For example, Aetna supported its denial by stating that John "was able to recognize reality and denied hearing or seeing what was not real."

74. This statement not only disregards John's repeated claims of hearing voices, but it also artificially "pads" Aetna's denial rationale and gives the impression that Aetna and the Plan only approve residential treatment for individuals who are not able to recognize reality and are having visual and auditory hallucinations. Neither Aetna, the Plan, or generally accepted standards of medical practice impose any such requirement to receive residential treatment care.

75. The same can be said of many of Aetna's other stated justifications for the denial such as,

"he was medically stable." Neither Aetna, the terms of the Plan, nor generally accepted standards of medical practice limit residential treatment to individuals who are not medically stable. In fact, generally accepted standards of medical practice require an individual to be stabilized medically before receiving psychiatric care.

76. Much of Aetna's justification for denying payment is predicated on factors such as these, which have no basis in the terms of the plan document or its Aetna's own criteria.

77. Aetna and the agents of the Plan breached their fiduciary duties to John when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in John's interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of John's claims.

78. The actions of Aetna and the Plan in failing to provide coverage for John's medically necessary treatment are a violation of the terms of the Plan and its medical necessity criteria.

## <u>SECOND CAUSE OF ACTION</u>

## **(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

79. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Aetna's fiduciary duties.

80. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

81. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

82. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

83. The medical necessity criteria used by Aetna for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the medical necessity criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

84. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for John's treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

85. For none of these types of treatment does Aetna exclude or restrict coverage of medical/surgical conditions by imposing restrictions such as an acute care requirement

for a sub-acute level of care. To do so, would violate not only the terms of the insurance contract, but also generally accepted standards of medical practice.

86. When Aetna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

87. Aetna and the Plan evaluated John's mental health claims using medical necessity criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

88. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, Aetna's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that John received. Aetna's improper use of acute inpatient medical necessity criteria is revealed in the statements in Aetna's denial letters such as a requirement of "behavior that demonstrates impaired judgment to the extent that serious harm has occurred or may occur, including risk of death."

89. Aetna does not impose acute level requirements such as "serious harm" and "risk of death" in order to qualify for subacute intermediate level facilities such as skilled nursing care.

90. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that John received. The Plan does not require individuals receiving treatment at sub-acute inpatient

facilities for medical/surgical conditions to satisfy acute medical necessity criteria in order to receive Plan benefits.

91. Treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

92. The Defendants cannot and will not deny that use of acute care criteria, either on its face or in application, to evaluate sub-acute treatment violates generally accepted standards of medical practice. They must and do acknowledge that they adhere to generally accepted standards of medical practice when they evaluate the medical necessity criteria of both mental health/substance use disorders and medical/surgical claims.

93. In addition, the level of care applied by Aetna failed to take into consideration the patient's safety if he returned to a home environment, as well as the risk of decline or relapse if less intensive care than what was medically necessary was provided.

94. Generally accepted standards of medical practice for medical and surgical rehabilitation under the Plan take into consideration safety issues and considerations of preventing decline or relapse when admission into an intermediate care facility, such as a skilled nursing or rehabilitation facility, is approved.

95. The actions of Aetna and the Plan requiring conditions for coverage that do not align with generally accepted standards of care for treatment of mental health and substance use disorders violate MHPAEA because the Plan does not impose similar restrictions and

coverage limitations on analogous levels of care for treatment of medical and surgical conditions.

96. In addition, Aetna deemed that care was not medically necessary because of a lack of "compelling indication for care in an inpatient setting during this time." Aetna does not define what constitutes "compelling indication."

97. The requirement of "compelling indication" by Aetna is an additional nonquantitative treatment limitation placed on mental health care that is not equally applied to medical or surgical care.

98. Aetna does not require an insured to provide "compelling indication" that they could not be successfully treated at a lower level of medical or surgical care. Instead, when it assesses medical or surgical claims, Aetna relies on the professional opinions of the insured's treatment team as well as generally accepted standards of medical practice.

99. The term "compelling" suggests a requirement of documentation beyond a simple preponderance of information and recommendations from clinicians. While the term "compelling" is a nebulous one, it appears that rather than requiring that an insured receiving residential mental health treatment demonstrate that the preponderance of the information available to the treating and reviewing physicians demonstrates the need for the treatment in question, the insured must prove there is little to no question that the recommended treatment is medically necessary.

100.    Aetna does not require "compelling" documentation, information, or evidence before coverage for medical or surgical treatment at analogous levels of care to residential treatment is provided under its Plan. Rather, the language of the Plan and generally accepted standards of medical practice do not require anything more than a

preponderance of the documentation, information, or evidence to provide coverage for medical or surgical care.

101.     In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Aetna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

102.     Aetna and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that Aetna and the Plan were not in compliance with MHPAEA.

103.     In fact, despite Mary's request that Aetna and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Aetna and the Plan have not provided Mary with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Aetna and the Plan have not provided Mary with any information about the results of this analysis.

104.     The violations of MHPAEA by Aetna and the Plan are breaches of fiduciary duty and also give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the medical necessity criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiff as make-whole relief for her loss;

(g) An order equitably estopping the Defendants from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiff for their loss arising out of the Defendants' violation of MHPAEA.

105.    In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1.    Judgment in the total amount that is owed for John's medically necessary treatment at Elevations under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.      Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's

Second Cause of Action;

3.      Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4.      For such further relief as the Court deems just and proper.

DATED this 11th day of September, 2022.


By _____s/ Brian S. King_____
         Brian S. King
         Attorney for Plaintiffs



State of Plaintiff's Residence:
New Jersey